CLEOPHUS JOHNSON *v*. STATE OF INDIANA.

[No. 976S317. Filed October 10, 1978.]

*Harriette Bailey Conn*, Public Defender of Indiana, *Bobby Jay Small, David P. Freund, Robert W. Hammerle*, Deputy Public Defenders, for appellant.

*Theodore L. Sendak*, Attorney General, *Walter F. Lockhart*, Assistant Attorney General, for appellee.

PIVARNIK, J.—Appellant Johnson was tried to a jury in the Elkhart Superior Court for the shooting death of John Smith. On February 17, 1976, Johnson was found guilty of first degree murder and was sentenced to life imprisonment on March 12, 1976.

This appeal presents eight issues for our review. As we find that there was reversible error, it is only necessary to treat the issue requiring reversal and an issue raising a problem which may reoccur on remand.

## I.

The reversible error concerns the trial court's refusal to allow appellant to present evidence in rebuttal to the testimony of court appointed psychiatrist, Dr. Yuhn. Following the appellant's plea of not guilty by reason of insanity, the trial court appointed two psychiatrists for the purpose of examining appellant pursuant to Ind. Code § 35-5-2-2 (Burns 1975). This statute states:

"At the trial of such cause, evidence may be introduced to prove the defendant's present sanity or insanity, or his sanity or insanity at the time at which he is alleged to have committed the act charged in the indictment or information. When an insanity defense is pleaded, the court

shall appoint two [2], or three [3], competent disinterested physicians to examine the defendant, and to testify at the trial. Such testimony shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of medical experts employed by the state and by the defense, if any. *The medical witnesses appointed by the court may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of such medical witness witnesses."* (emphasis added)

At trial, the direct examination of Dr. Yuhn was conducted by the court. The witness was then passed to the prosecutor and defense counsel for cross-examination. During the appellant's cross-examination of Dr. Yuhn, numerous questions were asked concerning Yuhn's psychiatric examination of appellant for the purpose of establishing the bases for Dr. Yuhn's opinion that appellant was legally sane at the time of the shooting. These questions related to whether the appellant had told the Doctor certain things during their interview, whether or not the appellant used certain words in his answers to Yuhn's questions, and whether the Doctor had inquired into certain subject areas. The Doctor answered all of these questions.

After both psychiatrists had testified, the defense called the appellant to the stand as a witness in rebuttal to the testimony of Dr. Yuhn. Following some preliminary questions, the appellant was asked whether he had heard Dr. Yuhn testify as to the amount of alcohol the appellant told him he had consumed on the day of the shooting. At this point the prosecutor approached the bench for the purpose of inquiring into the nature of the questioning to follow so that an objection might be formed. The defense counsel stated that the purpose of the questioning was to present testimony by appellant which would contradict the testimony of Dr. Yuhn as to what appellant told Dr. Yuhn. The prosecutor then made an objection, the gist of which was that Ind. Code § 35-5-2-2 contemplates only cross-examination and rebuttal evidence directed at the *opinion* testimony of the court ap-

pointed physicians. Thus, rebuttal testimony going to specific areas upon which the doctor's opinion was or was not based was improper under the statute. The trial court then ruled on the state's objection as follows:

"You have objected to a specific question, Mr. Miller, and I will sustain your objection to the question and also advise counsel for the defense that I will not permit the examination of this witness relative to the conversations he had with Dr. Yuhn for the purpose of impeaching Dr. Yuhn's statements, notes or recollections."

We refuse to subscribe to the statutory interpretation advanced by the state, and apparently adopted by the trial judge, that a court appointed psychiatrict may be discredited as to his ultimate opinion on the sanity of a defendant, but may not be impeached as to the bases upon which his opinion rests. This court has consistently held that an expert's opinion is entitled to no greater weight than lay testimony on the issue of sanity. *See, e.g. Sypniewski v. State,* (1977) 267 Ind. 224, 368 N.E.2d 1359, 1364. The primary difference between expert and lay testimony is that an expert is given the power to state an opinion based on facts of which he may or may not have personal knowledge. As this court once stated:

"In the realm of expert testimony, it is obviously preferable to have the opinion derived from a distillation of as much reliable information as possible. This results in a more intelligent opinion because an opinion is only as good as the data upon which it is based."

*Smith v. State,* (1972) 259 Ind. 187, 191, 285 N.E.2d 275, 277. *Cf. Summerlin v. State,* (1971) 256 Ind. 652, 271 N.E.2d 411; *White v. State,* (1944) 222 Ind. 423, 54 N.E.2d 106. It follows that for the jury, as the trier of fact, to assign the proper weight to the opinion of an expert witness, the parties must have the opportunity to place before them all of the available evidence related to the data upon which the opinion is derived. In the present case, the appellant sought to refute many of the facts which may have contributed to Dr. Yuhn's

opinion that appellant was sane. It would be improper for this court to speculate as to how the appellant's testimony would have been received by the jury had it not been excluded. We hold only that the statute requires that appellant should have been afforded the opportunity to present his version of what took place at the examination by Dr. Yuhn and that the denial of such opportunity constitute error.

A review of the record in this case indicates that the trial court's error cannot be characterized as harmless. The only evidence presented on the issue of appellant's sanity consisted of the testimony of the two court appointed psychiatrists, Dr. Yuhn and Dr. Price. Dr. Yuhn had stated that the appellant was sane at the time of the shooting, while Dr. Price testified that in his opinion, appellant was not legally responsible for his actions. Thus, there was a clear conflict in the evidence on the insanity issue and this court cannot say, as a matter of law, that appellant was not prejudiced by the exclusion of his rebuttal testimony.

## II.

The appellant also argued that the trial court erred in denying his Motion to Suppress incriminating statements he made to police. As this issue is likely to be raised again on remand, we proceed to treat it here.

The circumstances surrounding the confessions were as follows. Three police officers, who were investigating the shooting at John Smith's home, were informed by witnesses at the scene that the appellant was responsible for the crime and that he was presently staying at an address on Cleveland Street in Elkhart. The officers then proceeded to the address where they found appellant sitting on the front porch. As the officers approached appellant, they noticed that he had blood on his face. One of the policeman, Officer Boussom, asked appellant, "What happened?" Johnson responded that he had shot the man and that he wanted to turn himself in.

Officer Boussom immediately told appellant, "Sir, I must read you your rights and the *Miranda* warning." After reciting the full *Miranda* warnings, Boussom asked appellant if he understood each of the rights. Johnson answered that he did. Boussom then asked, "Having these rights in mind, do you wish to talk to us now?" Johnson answered, "Yes," and proceeded to tell Boussom about how he had confronted and shot John Smith following a scuffle at Smith's house earlier. Appellant was then taken to a nearby hospital where he was treated for minor injuries inflicted on him by Smith after Johnson had shot Smith. Approximately two hours after Johnson's statements on the porch, he was taken to the police station where he was once again advised of his constitutional rights. Appellant signed a written waiver to rights form and gave police a full confession.

At the hearing on the appellant's Motion to Suppress, the trial court found that appellant's first admission was a spontaneous statement to which *Miranda* did not apply. The trial judge further ruled that the confessions which followed the full *Miranda* warnings were free and voluntary. Accordingly, the Motion to Suppress was denied and all of appellant's statements were admitted into evidence at trial.

The appellant's appeal of this issue argues that the first statement was inadmissible because Officer Boussom's query, "What happened?", constituted a custodial interrogation which should have been preceded by *Miranda* warnings. Appellant then argues that his subsequent confessions should have been excluded because they were tainted by the illegality of the first statement. In the alternative, appellant asserts that the statement following the first *Miranda* warning was inadmissible in that the state failed to show, beyond a reasonable doubt, that appellant knowingly, intelligently and voluntarily waived his rights.

It is settled that the procedural safeguards of *Miranda* only apply to what the United States Supreme Court has termed

"custodial interrogation." *Oregon* v. *Mathiason,* (1977) 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; *Bugg* v. *State,* (1978) 267 Ind. 614, 372 N.E.2d 1156, 1158. Custodial interrogation refers to questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Mathiason, supra,* 429 U.S. at 494, 97 S.Ct. at 711, 50 L.Ed.2d at 719. The concept of custodial interrogation does not operate to extend the *Miranda* safeguards to spontaneous voluntary statements, i.e. statements which are either not made in response to questions posed by law enforcement officers while the defendant is in custody, *Bugg* v. *State, supra,* or statements which are made before the officers are given an opportunity to administer the *Miranda* warnings. *New* v. *State,* (1970) 254 Ind. 307, 259 N.E.2d 696. Nor does *Miranda* apply to questioning by police in the course of a general, non-accusatory, investigation of a crime. *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 478, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694; *Stallings* v. *State,* (1970) 255 Ind. 365, 264 N.E.2d 618, 620.

In the case at bar, the trial court concluded that the first statement made by appellant was spontaneous and thus found *Miranda* inapplicable. We agree. The facts show that the arresting officers were directed to the appellant's location by witnesses who were present at the scene of the homicide. These witnesses informed the officers of appellant's address, identity and the fact that appellant was the perpetrator of the killing. Thus, when the three policemen arrived at Johnson's residence, their purpose was to apprehend the accused whom they suspected was guilty of the crime. In light of these facts, when the three officers confronted the appellant on the porch, appellant was deprived of his freedom of action in a significant way since he was clearly not free to leave. Appellant was thus in "custody" as that term has been defined by *Miranda* and subsequent cases. The question remaining

then is whether or not the officer's statement "What happened?" constituted an interrogation.

The term "interrogation" has been defined as a process of questioning by law enforcement officials which lends itself to obtaining incriminating statements. *Escobedo* v. *Illinois*, (1964) 378 U.S. 478, 485, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977, 986. Not every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation. *See e.g., Bugg* v. *State, supra.* Rather, it is necessary to view the statement in the context in which it was made. If, after having done so, it does not appear that the purpose of the remark was to obtain a confession from the accused, *Miranda* is not triggered and it is not necessary that the accused first be advised of his rights. Here, the arresting officers had just exited their squad cars and were approaching appellant whom they had strong reason to suspect had recently killed a man and was therefore potentially dangerous. Although appellant made no attempt to flee, it appeared that he had just been involved in a fight as there was blood over his face and body. It was within the context of these facts that the officer asked appellant what happened. Under these circumstances, the officer's opening remark was more in the nature of a greeting intended more for its calming effect than for obtaining an admission. The appellant's statement that he shot the man and wanted to turn himself in was thus not the product of questioning but rather was a spontaneous voluntary statement unsolicited by police. This conclusion is reinforced by the appellant's expressed willingness to cooperate as evidenced by the continuation of the statement after full *Miranda* advisement. The fact that the officer did not intend to initiate a response to interrogation is evidenced by his action in stopping the appellant until he had advised him of his rights and determined that he was willingly and voluntarily making a statement. We therefore hold that appellant's first statement was not the product of custodial interrogation to which the

*Miranda* safeguards apply. The statement was properly admitted into evidence by the trial court.

Johnson also argues that since his first statement was allegedly obtained in violation of *Miranda,* his subsequent statements were thereby tainted and so should have been suppressed. In view of the above finding that there was no *Miranda* violation this contention is without merit. Even if the first statement had been obtained illegally, appellant's position would be incorrect. Appellant's theory is premised on the idea that once a defendant has "let the cat out of the bag," *United States* v. *Bayer,* (1947) 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654, any subsequent *Miranda* warnings are meaningless unless there are factors intervening which tend to show that the later confessions are voluntary, independent of the initial statement. We think this is but another way of stating the general rule that the voluntariness of any custodial statement must be determined from an examination of the totality of the facts surrounding its making. *Murphy* v. *State,* (1977) 267 Ind. 184, 369 N.E.2d 411, 414. While it is true that Johnson had "let the cat out of the bag" in his initial admission, this was only one factor bearing on the disputed issue of the voluntariness of the later, fully advised statements. *Tanner* v. *Vincent,* (2d Cir.) 541 F.2d 932, 937,*cert. denied* (1976) 429 U.S. 1065, 97 S.Ct. 794, 50 L.Ed.2d 782. Thus, in order to determine voluntariness, we must look to the totality of the circumstances surrounding the second statement taken on the porch and the confession given later at the police station. In doing this, we do not weigh the evidence but rather determine whether there was substantial probative evidence to support the trial court's finding. *Murphy, supra,* 369 N.E.2d at 414; *Works* v. *State,* (1977) 266 Ind. 250, 362 N.E.2d 144.

The record reveals that after appellant initially stated that he had shot the man and wanted to turn himself in, Officer Boussom immediately advised appellant of his rights.

Johnson orally acknowledged his understanding of the rights, waived them and proceeded to give a confession. Although there was evidence that Johnson had sustained minor injuries and had consumed alcohol prior to the shooting, the interrogating officers testified that there was nothing unusual about his physical characteristics. Also, there was no obvious indication that appellant was intoxicated nor did he exhibit an unusual gait or slurred speech. After being treated at the hospital, appellant was taken to the police station where he was again advised of his rights. Appellant executed a written waiver form and gave a third statement to police. In view of the conflicting evidence on the issue, we refuse to reverse the trial court's ruling that appellant's second and third statements were made freely and voluntarily. *Richardson* v. *State*, (1978) 268 Ind. 61, 373 N.E.2d 874, 875. There was no error in the admission of appellant's confessions.

The judgment of the trial court is reversed and this case remanded for further proceedings not inconsistent with this opinion.

Givan, C.J., Prentice, J., concur; DeBruler, J., concurs with opinion; Hunter, J., dissents without opinion.

## CONCURRING OPINION

DEBRULER, J.—I find that I cannot join in the last part of the Court's opinion wherein it deals with the admissibility of the second inculpatory statement given by appellant upon the hypothetical assumption that the first inculpatory statement was taken in violation of the requirements of *Miranda* v. *Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Unless I know the exact nature of such supposed violation, including the circumstances surrounding it and the type and extent of custody involved, I am simply at a loss to decide for example, whether the State by the evidence actually adduced sustained its burden of demonstrating that appellant voluntarily and intelligently relinquished his Sixth Amend-

ment right to counsel prior to making the second inculpatory statement.

Note.—Reported at 380 N.E.2d 1236.