Sidney G. HOPKINS, Appellant,

v.

STATE of Indiana, Appellee.

No. 33S00–8905–CR–364.

Supreme Court of Indiana.

Dec. 3, 1991.

Rehearing Denied Feb. 14, 1992.

---

Susan K. Carpenter, Public Defender of Indiana and J. Michael Sauer, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen. of Indiana and Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Murder and Felony Murder (Robbery). As only one death occurred, the trial court correctly merged the convictions, entered judgment against appellant for murder, and sentenced him to an aggravated term of fifty-five (55) years.

The facts are: On Saturday morning, August 8, 1987, Irene Sullivan, who lived on Cottage Avenue in New Castle, Indiana, became concerned that her neighbor, Clarence Guffey, was not up and about as usual. Upon investigating and getting no response at the door, Mrs. Sullivan looked through a window and saw Guffey lying on the floor. She immediately telephoned 911 for help. Police and medics responded and found the victim lying dead in a pool of blood; the walls and ceiling and the victim were covered with blood. An autopsy revealed he had suffered fifteen blunt-force wounds to the head and had bled to death. The house had been ransacked, with drawers turned out, papers strewn about, and two rifled billfolds on the floor.

The previous night, appellant had been drinking all night, first at a bar and then at a party, leaving one friend's home about 6:00 a.m. Saturday and appearing at another's about 6:30. He reappeared there around 9:00, having purchased more liquor between 8:30 and 9:00. Around 10:30, he went to his aunt's house, asking whether she was monitoring her police scanner, mentioning he had seen police cars headed towards Cottage Avenue. Later that day he made inculpatory remarks to several persons. He purchased a handgun from his cousin, who retrieved it after realizing how intoxicated appellant had become; when she explained she feared it would get him into trouble, he tearfully replied that he already was.

The following day, appellant explained to another cousin, Jeff South, that on Saturday morning, he noticed Mr. Guffey working out in his back yard and so let himself in the front door. While looking for valuables, he was discovered by the victim who, he claimed, had a shotgun. He struck the victim on the head with a tire tool, causing him to fall back against the wall, and when he arose, appellant struck him some more. Appellant then resumed looking for money, finding $700. He explained to his cousin that on previous occasions he had stolen cash from the victim's house, once finding as much as $1500. As he related all this, appellant was carrying a bottle of whiskey and displayed a .25 caliber pistol to his cousin, saying he was willing to shoot an officer in order to draw police into killing him.

By the next day, Monday, as a result of extensive investigation including interviews with members of his family, appellant became the focus of the murder case. When so informed, appellant, accompanied by his mother, brothers and sister, turned himself in to police. While being strip-searched after booking, he remarked, "I did it ... I think I killed him." When asked why, he explained he had been "really messed up" on some "bad acid" from Muncie.

Appellant contends the trial court erred in refusing to grant a mistrial or admonish the jury following the prosecutor's allegedly improper comments upon his exercise of his right not to testify. During his lead closing argument to the jury, after recapitulating the array of witnesses for the State who had related appellant's admissions to perpetrating the crime, he stated, "it is certainly worthy of comment that you never heard any testimony during this trial that the defendant was anywhere else" than the victim's home when he was murdered. Appellant immediately objected on the basis the remark impinged upon his right to remain silent, moved for a mistrial, and alternatively requested the jury be admonished to disregard the remark. After the trial court denied both requests, the prosecutor repeatedly referred to the

State's evidence as "the only evidence in this case."

Appellant argues that because the jury reasonably could have interpreted the prosecutor's comments as going to his failure to testify, the denial of his motions was reversible error, citing *Williams v. State* (1981), Ind., 426 N.E.2d 662 and *Dooley v. State* (1979), 271 Ind. 404, 393 N.E.2d 154. In *Dooley,* the prosecutor cautioned the jury to draw no inference of guilt from the defendant's failure to testify, yet then proceeded to emphasize the absence of any evidence to support an alibi defense which, the prosecutor noted, specifically was authorized by statute. In *Williams,* all the evidence placed the defendant at the scene of the crime, and the prosecutor's remarks highlighted the fact that all the other persons present had testified.

■ In contrast, however, the prosecutor's remarks in the instant case were focused not on the absence of testimony from the defendant, but rather on the evidence from five different witnesses to whom appellant made admissions concerning the crime. As we have stated, "if in its totality the prosecutor's comment is addressed to other evidence rather than the defendant's failure to testify, it is not grounds for reversal." *Hill v. State* (1988), Ind., 517 N.E.2d 784, 788. Arguments which focus on the uncontradicted nature of the State's case do not violate the defendant's right not to testify. *Flynn v. State* (1986), Ind., 497 N.E.2d 912; *see also Callahan v. State* (1988), Ind., 527 N.E.2d 1133, 1136 wherein we held the remark, "Let's see, has there been any witnesses presented who have told us where Joey was that morning?" did not focus on Joey Callahan's failure to testify and thus was not improper.

We find no impingement of appellant's right to remain silent and no error in the denial of his motion for mistrial and request for admonishment.

Appellant contends the trial court erred in refusing to suppress statements he made to Jail Officer Criswell. After the police investigation focused on him, appellant turned himself in to authorities at New Castle Police Headquarters. Captain Roy Young, noting that appellant was very intoxicated, placed him under arrest but decided to make no attempt to interrogate him at that time. Appellant was turned over to Officer Criswell to complete inprocessing. While he was being strip-searched, appellant said, "Criswell, I think I did it." When the officer responded, "What?" appellant replied, "I think I killed him." The officer then asked "Why?" and appellant explained he had "got some bad acid" (L.S.D.) from Muncie that had "really messed him up." In ruling on appellant's motion to suppress this conversation, the trial court excluded the remarks from Criswell's question "Why?" onward, finding it to be the product of custodial interrogation without the safeguards of *Miranda* warnings.

Appellant argues it was error not to suppress the remarks preceding the "Why?". Citing *Light v. State* (1989), Ind., 547 N.E.2d 1073 and numerous federal cases for the proposition that appellate assessment of the voluntariness of statements made during custodial interrogation involves a review of the totality of the surrounding circumstances, appellant points out that he was tired, upset, extremely intoxicated, and being strip-searched at the time of his admissions. He maintains his remarks were involuntary under art. 1, §§ 12, 13, and 14 of the Indiana Constitution because they were not the freely self-determined product of a rational intellect and a free will, citing *Robbins v. State* (1968), 250 Ind. 219, 235 N.E.2d 199.

■ However, the foregoing standards of voluntariness apply only to admissions made during custodial *interrogation;* volunteered statements are admissible absent *Miranda* warnings. *See Lowery v. State* (1985), Ind., 478 N.E.2d 1214, *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900. While appellant's first remark, "Criswell, I think I did it," indisputably was volunteered, appellant insists the officer's response of "What?" initiated an interrogation because Criswell knew to what appellant was referring and should have known it was at least reasonably likely to evoke an incriminating response, citing *Rhode Is-*

*land v. Innis* (1980), 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297. Appellant then goes on to argue the admission of his second remark, "I think I killed him," was error. He further maintains that because the testimony of Officer Criswell would be viewed as highly reliable next to that of the other witnesses who related his inculpatory admissions, it undoubtedly contributed to his conviction and thus was not harmless error, citing *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.

However, "[n]ot every statement uttered by a police officer which is punctuated with a question mark will necessarily constitute an interrogation. [Citation omitted.] Rather, it is necessary to view the statement in the context in which it was made. If, after having done so, it does not appear that the purpose of the remark was to obtain a confession from the accused, *Miranda* is not triggered and it is not necessary that the accused first be advised of his rights." *Johnson v. State* (1978), 269 Ind. 370, 377, 380 N.E.2d 1236, 1240. The record here reveals Officer Criswell's response of "What?" was a reflex, one not intended to obtain information from appellant. Appellant thus was not under interrogation and his second remark, being volunteered, did not trigger either *Miranda* or state constitutional concerns.

It was not error to admit evidence of appellant's admissions made to Officer Criswell.

Appellant contends the trial court erred in refusing to suppress remarks he made in response to questioning by Captain Young. Appellant had the conversation with Officer Criswell discussed above at approximately 1:30 a.m. on August 11, 1987. At approximately 9:30 that morning, he was transported from jail back to police headquarters where he again was photographed. Captain Young read him his *Miranda* rights from a form; appellant then read the form himself and signed it. An unrecorded interrogation then ensued for twenty to thirty minutes, during which appellant explained he had been drunk since early Saturday and could remember very little. He was able to recollect the follow-

ing: being in a bar at about 2:00 a.m. on Saturday (the day of the murder); waking up Saturday evening at his mother's kitchen table with over $300 in his pocket and not knowing where it had come from; being with his cousins the following day, but recalling none of their conversations; buying more liquor; and obtaining a gun from his cousin. He was unable to recall anything about the victim being killed. When appellant said he was getting sick and would like to go back to his cell and sleep, he was returned to the jail.

At about 1:30 that afternoon, appellant was returned to police headquarters. With his mother present, appellant again was advised of his rights, read the *Miranda* form and signed it at 1:44 p.m. He then said he could not remember any more than he had that morning. Toward the end of this unrecorded session, appellant began exhibiting signs of nausea, and according to Captain Young's testimony, the following occurred:

"I took the waste paper basket and scooted it over to him. He said, Roy, I'm getting sick, would you take me back to the jail. I said, okay, Sid. He said, now I want to tell you right now, once I remember, I'll tell you, and I said, well Sid, when you're taken to Court, you'll be appointed an attorney and I guarantee you your attorney is going to tell you not to tell me anything, so if you're interested in telling me or if you remember, you'd better tell me now, and again, he said, Roy, I wished I could remember, I want to get this off my chest and no lawyer can stop me from telling you if I want to do that when I remember and I will promise you I'll tell you, and I took Sidney back to Henry County Jail."

Appellant argues these statements were inadmissible because they were tainted by his prior inculpatory admissions to Officer Criswell. He cites federal precedent summarized in our opinion in *Hendricks v. State* (1978), 267 Ind. 496, 371 N.E.2d 1312, *cert. denied,* 436 U.S. 961, 98 S.Ct. 3079, 57 L.Ed.2d 1127, to the effect that once an accused has involuntarily "let the cat out of the bag," for any subsequent

statement to be admissible there must be a break in the intervening chain of events sufficient to insulate the latter from the former. As decided above, however, the most damaging admissions to Officer Criswell were volunteered by appellant; and, while the remarks suppressed by the trial court as being the product of improper custodial interrogation might have been sufficient to "let the cat out of the bag," the lack of proximity and the intervening circumstances of the marked improvement in appellant's lucidity lead us to conclude the statements to Captain Young were not tainted by the preceding improperly elicited remarks. *Id.*

■ Citing *Light, supra,* he also argues both the 9:30 a.m. and 1:44 p.m. statements were involuntary, when one considers the totality of the circumstances, his low level (fifth grade) of reading comprehension, and his condition of being still intoxicated, very tired, and sick. He cites as additional proof the facts that he had to ask what the charge was after being told the previous night it was murder, and that he needed to have another person present read him the newspaper article describing the murder. He maintains that although by 1:44 p.m. he no longer was intoxicated, he was still tired and sick and impaired such that his statement was involuntary. However, the record reveals that by 1:44 p.m. he was "stone sober" and even by 9:30 a.m. his speech was not slurred and was understandable. It seems reasonable he might not have been able to remember what transpired when he was inprocessed while intoxicated the night before. Nevertheless, the record shows that he was properly advised of his rights that morning and that he indicated he understood them. Apparently he did, for when he began feeling ill at the end of each session, he requested that the interrogation cease. We see no evidence of any coercion or deception here to render his consent invalid.

Appellant also maintains that his 1:44 p.m. remarks were inadmissible because Captain Young failed to scrupulously honor his request to cease interrogation, instead "baiting" him with the insinuation it would be his last opportunity to talk to him unhampered by an attorney. However, this specific objection was never made in the court below; it therefore has been waived. *Daniel v. State* (1988), Ind., 526 N.E.2d 1157. Moreover, the record shows that when appellant asked to be returned to jail, interrogation ceased and he was told, "Okay, Sid," and then appellant himself initiated the dialogue concerning his desire to tell everything as soon as he was able to remember it. We find here no failure to honor appellant's request to stop the questioning.

The admission of evidence of appellant's remarks to Captain Young was not error.

Appellant contends the trial court erred in denying his motion for change of venue from the county based on prejudicial publicity. Articles appearing in a New Castle daily newspaper and local radio broadcasts during the period covering August 9–25, 1987, included coverage of the prosecutor's comments that "It was a particularly brutal and violent crime. I cannot see any justification for not seeking the death penalty." They also reported the facts that appellant was out on bond for unrelated felony charges at the time of the murder and that he had turned himself in on the instant charges. Due to this publicity, appellant filed motions for change of venue from the county, for a test jury to determine prejudice from pretrial publicity, and an alternative motion to increase the number of peremptory challenges available to the defense. All these motions were denied.

Citing *Hare v. State* (1984), Ind., 467 N.E.2d 7 for the proposition that a change of venue requires a showing of a high probability of such widespread bias in the community that an impartial jury cannot be obtained, appellant points out that even after exhausting all twenty of his peremptory challenges, all but one of the jurors seated had read news accounts of the case or had discussed it with friends. He further notes that to prevail on appeal from the denial of a change of venue, an appellant must show the existence of prejudicial pretrial publicity, *Timmons v. State* (1986),

Ind., 500 N.E.2d 1212, which is defined as that containing inflammatory material not admissible at trial or misstatements or distortions of the evidence, *Kappos v. State* (1984), Ind., 465 N.E.2d 1092. He contends the prosecutor's reported implication that the crime was so "brutal and violent" as to call for the death penalty, which is not a statutory aggravator under Ind.Code § 35–50-2-9, along with the information that he had felony charges pending against him, which was inadmissible at trial, *Montgomery v. State* (1980), 274 Ind. 544, 412 N.E.2d 793, comprised just such inflammatory material, as did the coverage referring to his surrender to police by leaving the impression he had confessed.

■ As the State points out, however, in order to secure reversal, appellant must show not only that prejudicial publicity existed but that jurors were unable to set aside their preconceived notions of guilt and render a verdict based only on the evidence. *Moore v. State* (1987), Ind., 515 N.E.2d 1099. Appellant here has made no showing that any jurors were unable to set aside their preconceptions or that any challenges for cause due to prejudice resulting from pretrial publicity were improperly overruled. It was not reversible error to overrule appellant's motions regarding change of venue.

Appellant contends the trial court erred in denying his motion to suppress and admitting over his objection physical evidence seized pursuant to an overbroad and improperly executed search warrant. Pursuant to a warrant authorizing a search of appellant's residence and car for the following items, "[e]vidence of commission of crime of murder of Clarence A. Guffey, including, without limitation, black tire tool or tire iron, blue jeans and blue shirt," Captain Stephens of the New Castle Police Department seized from appellant's car a towel with a spot that appeared to be blood. Forensic tests revealed the presence on the towel of a hair sufficiently similar to the victim's hair standard to be of common origin.

Citing *Baker v. State* (1983), Ind., 449 N.E.2d 1085 and *Hester v. State* (1990),

Ind.App., 551 N.E.2d 1187, appellant argues the warrant's "evidence of commission of crime ... without limitation" language clearly was so overbroad as to be invalid, leaving the tire tool, blue jeans and blue shirt the only items described with sufficient particularity to be validly covered by the warrant. Appellant maintains that because the warrant was invalid for overbreadth, Captain Stephens had no lawful right to be in his car and thus the plain view exception is inapplicable. He also argues, citing *Hewell v. State* (1984), Ind. App., 471 N.E.2d 1235, that seizure of the towel did not fall under the plain view doctrine because it fails to meet the requirement of inadvertence, given Captain Stephens' testimony that he was looking for bloody clothing. He also argues it further was not readily apparent there was any nexus between the crime and the towel at first glance or thereafter, citing our decision in *Lance v. State* (1981), Ind., 425 N.E.2d 77. He thus concludes admission of this physical evidence linking him to the murder was reversible error.

■ The State contends seizure of the towel comports with all three of the plain view exception requirements: that 1) the officer is in a place he is lawfully entitled to be; 2) the item is discovered inadvertently; and 3) it is immediately apparent that the item is evidence of a crime. Here, the officer had the right to search the car for those items particularly described in the warrant and thus clearly had a right to be there. Moreover, regardless of appellant's assertion to the contrary, the federal good-faith exception enunciated in *United States v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 has been held applicable to the prohibition of unreasonable search and seizure found in art. 1, § 11 of the Indiana Constitution. *Mers v. State* (1985), Ind. App., 482 N.E.2d 778. From Captain Stephens' testimony alluded to above, it is apparent that the officer was not using the warrant specifying clothing as a ruse to search for bloody towels, and thus his discovery of the towel indeed was inadvertent. He was aware the homicide had been unusually sanguinary such that a bloods-

tained towel would immediately appear related to the crime.

The admission of evidence derived from the seizure of the towel was not error.

Appellant contends the trial court erred in refusing to instruct the jury on the lesser offenses of reckless homicide and criminal recklessness. He tendered several instructions bearing on these lesser offenses and argues they should have been given because they were correct statements of the law, were required by the evidence at trial and were not covered by other instructions, citing *Davis v. State* (1976), 265 Ind. 476, 355 N.E.2d 836. Citing *Jones v. State* (1988), Ind., 519 N.E.2d 1233, he notes the charging instrument must allege facts which include all the elements of the lesser offenses, and maintains the information here charging felony murder satisfies that requirement as its failure to specify any level of intent to kill necessarily includes "recklessly." He further maintains the final requirement for giving a lesser-included-offense instruction, that the evidence support a finding that the lesser crime was committed while the greater was not, *id.*, is satisfied here by evidence of his intoxication at the time of the killing.

▆▆▆ As this Court has noted in prior decisions, however, the absence of specific intent to kill in an allegation of felony murder signifies not that all lesser levels of culpability are included therein, but rather that none are; no lesser homicide offenses are included in the crime of felony murder. *See, e.g., Fleener v. State* (1980), 274 Ind. 473, 412 N.E.2d 778. There is ample evidence that the killing was not an act of recklessness. *See Mitchell v. State* (1989), Ind., 541 N.E.2d 265.

Because instructions on lesser-included offenses were foreclosed here both by the language of the charging instrument and by the lack of any evidence in support, the trial court did not err in refusing to give them.

Appellant contends the trial court erred in allowing over his objection the forensic pathologist, Dr. John Pless, to characterize in his testimony certain abrasions on the back of the victim's hands as "defensive wounds." He cites *Reburn v. State* (1981), Ind., 421 N.E.2d 604 for the proposition that opinion testimony is not permitted where the jurors are as well qualified as the witness to form an opinion based upon the facts. He cites *West v. State* (1985), Miss., 485 So.2d 681 wherein the Mississippi Supreme Court held a doctor's testimony that "defense wounds" on the victim's hands resulted from an attack improperly impinged upon the exclusive realm of the jury as to what the victim was doing when injured. He also argues Dr. Pless' remark was not relevant because it had no tendency to prove any material fact, such as the attacker's intent or whether force was used, and that its tendency to conjure up an image "of a helpless man trying vainly to defend himself against a brutal attack" made the characterization unduly prejudicial.

▆▆▆ While *Reburn* and *West* do state the general rule, this Court has held that an expert may testify as to his special knowledge of a subject even where it is not beyond the understanding of the average juror. *Wissman v. State* (1989), Ind., 540 N.E.2d 1209. Appellant claims Dr. Pless displayed no special knowledge of defensive wounds. As the State points out, however, Dr. Pless has supervised over 750 autopsies per year and has performed over three thousand. His experience in examining and evaluating wounds undoubtedly was an aid to the jury; his characterization of the hand abrasions thus was relevant. And while it also undoubtedly was prejudicial, it was not unduly so, for the inferences and images likely to be drawn therefrom would be accurate ones, part of the *res gestae* of the crime. As we have stated previously, "perpetrators of such acts are not entitled to have their deeds completely sanitized when evidence is submitted to a jury." *Shelton v. State* (1986), Ind., 490 N.E.2d 738, 743. We see no error in the admission of Dr. Pless' testimony concerning the victim's defensive wounds.

▆▆▆ Appellant contends the trial court erred in denying his motion for funds to employ an eyewitness identification expert

and in refusing his tendered instruction regarding identification evidence. Four witnesses testified having seen someone in the victim's yard on the morning of the murder. One of them, Irene Sullivan, identified appellant from a lineup conducted two and a half months after the crime. By the time of the lineup, Mrs. Sullivan had learned from media coverage that appellant, whom she had known as a neighbor eight to ten years earlier, was charged with the crime. Upon choosing appellant from the lineup, she asked the chief investigator, "How did I do?" and he responded, "You done just fine."

Prior to trial, appellant filed a motion for funds ($260) to employ an eyewitness identification expert, a professor specializing in the areas of perception and recall, to help defense counsel prepare to cross-examine Mrs. Sullivan and to testify regarding eyewitness identification in general. The motion was denied. Acknowledging that the denial of funds to employ expert witnesses for indigent defendants generally will be reversed only for an abuse of the trial court's discretion, *Hough v. State* (1990), Ind., 560 N.E.2d 511, appellant argues the denial of his motion resulted in substantial prejudice to him. He cites *Ake v. Oklahoma* (1985), 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53, 62, that fundamental fairness entitles indigent defendants to the "basic tools of an adequate defense," which may be assessed using three factors: 1) the private interest affected by the State's action; 2) the governmental interests affected if the safeguard is provided; and 3) the probable value of, and the risk of erroneous deprivation of the protected interest in the absence of, the additional safeguard sought.

Concentrating on the third factor, appellant argues that an eyewitness identification expert would have been of considerable assistance to his defense, that the refusal to grant funds therefor created risk of error in the proceeding, that he thereby was denied equal protection, and that the resulting prejudice constitutes reversible error, *Hough, supra*. In support, appellant cites a line of cases mirroring the trend to recognize the "built-in potential for error in eyewitness cases" and the great care required in scrutinizing this type of testimony. *People v. Daniels* (1982), 88 A.D.2d 392, 453 N.Y.S.2d 699, 704. *See also United States v. Evans* (2nd Cir.1979), 484 F.2d 1178; *People v. Beckford* (1988), 141 Misc.2d 71, 532 N.Y.S.2d 462. In *Beckford*, the court cited the results of empirical studies demonstrating the psychological processes at work which can impair the integrity of witness identification. *See also* Judge Posner's recent summary of the pitfalls of memory and eyewitness testimony in *Krist v. Eli Lilly & Co.* (7th Cir. 1990), 897 F.2d 293. Appellant reasons that absent any expert testimony or cautionary jury instructions to this effect, given the circumstances of Mrs. Sullivan's knowing, seeing, hearing about him on television, and picking him out of a lineup, the risk of inaccurate resolution of the identification issue was so high as to justify a new trial, citing *Ake, supra*.

While the weight of authority favors admitting expert testimony as to general hazards of identification evidence in certain circumstances, it fails to dispose of the issue at hand, which is whether the failure to fund such testimony was so prejudicial as to amount to an abuse of discretion. *Ake, supra*. Here, the abundance of other evidence tending to identify appellant as the perpetrator leads us to conclude it was not so prejudicial as to require reversal.

■ Although appellant's tendered cautionary instruction on eyewitness testimony, taken from *United States v. Telfaire* (D.C.Cir.1972), 469 F.2d 552, reflects settled federal case law and essentially mirrors the concerns discussed above, this Court has held that "Indiana law, unlike federal law upon which appellant's instruction was based, is distinctly biased against jury instructions which single out eyewitness identification testimony." *Brown v. State* (1984), Ind., 468 N.E.2d 841, 843. Moreover, a trial court should not give instructions which tend to emphasize the testimony of any single witness, *Perry v. State* (1989), Ind., 541 N.E.2d 913, or group of witnesses, *Patrick v. State* (1987), Ind., 516 N.E.2d 63.

The trial court did not err in denying appellant's request for funds to hire an eyewitness identification expert and in refusing his tendered instruction thereon.

■ Appellant contends the trial court erred in refusing his Tendered Final Instructions Nos. 3, 4, 5 and 6. For refusal of a tendered instruction to constitute error, it must be a correct statement of the law, it must be supported by the evidence in the record, and its substance must not have been covered adequately by other instructions given. *Morgan v. State* (1989), Ind., 544 N.E.2d 143; *Davis, supra.*

■ Tendered Instruction No. 3 was a federal criminal pattern instruction concerning the weight to be given expert witness testimony. Because seven experts testified at his trial, and because it was a correct statement of the law, *Woolston v. State* (1983), Ind., 453 N.E.2d 965, appellant argues No. 3 should have been given. However, our opinion in *Woolston* goes on to say that it is not error to refuse an instruction on expert witnesses where one is given on weighing the testimony of witnesses in general. Here, the Court's Final Instruction No. 19 adequately covered that subject. Moreover, the trial court gave its own instruction, No. 21, covering expert testimony. It was not error to refuse Tendered Instruction No. 3.

For the same reasons, Tendered Instruction No. 5, addressing the testimony of law enforcement officers, also was properly refused.

■ Tendered Instruction No. 4 instructed the jury to presume that appellant is a person of good character. He maintains this is a correct statement of the law and was approved, as modified, in *Hitch v. State* (1972), 259 Ind. 1, 284 N.E.2d 783. *Hitch*, however, included one qualifying phrase not included in appellant's version: "[T]hough the jury might believe the defendant had a good character before the alleged crime, that would not avail him as a defense or entitle him to an acquittal" once rebutted by proof of guilt beyond a reasonable doubt. *Id.* at 13, 284 N.E.2d at 790. As pointed out by the Court of Appeals in

*Crabtree v. State* (1989), Ind.App., 547 N.E.2d 286, this omission alone renders the instruction fatally defective. As it was not a correct statement of the law, there was no error in refusing Tendered Instruction No. 4.

Tendered Instruction No. 6 dealt with impeachment of witnesses and informed the jurors they could consider impeaching evidence in judging credibility. Despite appellant's assertion that no instruction given covered what kinds of evidence could be used to discredit witness testimony, the court's Final Instruction No. 20 in fact did adequately cover inconsistent statements and how to use them in weighing testimony.

The trial court did not err in refusing appellant's Tendered Instructions Nos. 3, 4, 5 and 6.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER and DICKSON, JJ., concur.

KRAHULIK, J., dissents with separate opinion.

KRAHULIK, Justice, dissenting.

I respectfully dissent from the majority's opinion holding that the prosecutor's comments to the jury during final argument did not constitute reversible error. The prosecutor clearly commented on Hopkins' failure to testify when he stated that:

[I]t is certainly worthy of comment that you never heard any testimony during this trial that the defendant was anywhere else from 6:30 in the morning until 8:30 to 9:00 in the morning on Saturday, August 8, 1987.

This comment was immediately followed by a request for mistrial and, alternatively, a request that the jury be admonished. The court denied both requests. To me, it is clear that the trial court should have admonished the jury to disregard the prosecutor's argument because this comment clearly infringed upon the defendant's exercise of his Fifth Amendment right to not testify. *Moore v. State* (1977), 267 Ind. 270, 369 N.E.2d 628, *Dooley v. State* (1979), 271 Ind. 404, 393 N.E.2d 154, and *Williams v.*

*State* (1981), Ind., 426 N.E.2d 662. While the prosecutor's comment did not constitute fundamental error, in my opinion the trial court's refusal to admonish the jury constituted reversible error pursuant to the above-stated precedent.