**Walter DYE, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9801–DP–55.

Supreme Court of Indiana.

Sept. 30, 1999.

Teresa D. Harper, Bloomington, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Janet Brown Mallett, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Walter Dye was convicted of the murder of Hannah Clay, age fourteen, Celeste Jones, age seven, and Lawrence Cowherd III, age two. A jury recommended that the death sentence be imposed, and the trial court imposed the death sentence. In this direct appeal Dye contends that (1) the State committed numerous discovery violations; (2) his right to be free from self-incrimination was violated when he was questioned without Miranda warnings; (3) the trial court erred by excusing a juror for cause on the State's motion and failing to excuse two jurors for cause upon his motion; (4) his jury was not selected from a representative cross-section of the community; (5) the trial court erred when it modified his tendered penalty phase instruction on clemency; and (6) death is not the appropriate sentence based on the weighing of aggravating and mitigating circumstances and the "residual doubt" of his guilt. We affirm.

**Factual and Procedural Background**

Myrna Dye decided to leave Dye, her husband of four years, in early July, 1996. According to Myrna, the couple constantly fought, their sexual relationship had become nonexistent, and Dye had become "real grouchy" toward Myrna's daughter Hannah Clay, who lived with the couple. On Monday July 15, Myrna signed a lease for a furnished apartment located seven blocks from where she and Dye resided. That evening Dye confronted Myrna about her plans to leave, and she confirmed his suspicions. According to Myrna, Dye appeared "kind of angry" and told her "I can have something done to you and have an alibi because I would be at work." He added, "I'm going to make sure you suffer the rest of your life, and everybody is going to know who been there." The next day, while Dye was at work, Myrna and Hannah moved out.

The following Sunday, July 21, Myrna and another of her daughters, Potrena Jones, went to work the night shift at a nursing home. Hannah remained at the apartment with Myrna's two grandchildren, Lawrence Cowherd III, age two, and Celeste Jones, age seven. Lawrence was Potrena's son, and Celeste was the daughter of Theresa Jones, another of Myrna's daughters. Theresa was supposed to have worked the afternoon shift at the same nursing home where Myrna and Potrena went to work, but had not shown up for work. Myrna was angry and called Theresa at the home Theresa shared with Potrena and their two children. Theresa's boyfriend, John Jennings, eventually answered the phone, and Myrna had harsh words for both of them.

At the end of their shift, Myrna and Potrena took the bus home. As they ap-

proached the apartment at about 8:00 a.m., they saw several police cars. They soon learned that Hannah's partially nude body had been found in the apartment and that Celeste and Lawrence were missing. An autopsy later revealed that Hannah had been beaten with what the pathologist believed to be a crowbar and a hammer. Her body sustained blunt force injuries as well as ligature strangulation and stab wounds to the neck and hand. The blunt force injuries were applied with such force "to have crushed the front of the chest wall back toward the spine, crushing the heart and the lungs in between." A rape kit was collected during the autopsy. Although the swabs of her body showed no evidence of sperm, a wet washcloth containing seminal fluid was found on a bed near Hannah's body.

A search for Celeste and Lawrence was promptly begun. At about 2:00 p.m., a police officer found a bundled comforter among some tall weeds along an alley near Myrna's apartment. Two trash bags containing the lifeless bodies of Celeste and Lawrence were found in the comforter. Both children had sustained injuries consistent with being hit on the head with a fist. Lawrence had also been hit in the left lower chest and liver, and Celeste had been stabbed with a knife. Lawrence had been strangled with a lamp cord taken from Myrna's apartment, and Celeste had been strangled with an extension cord.

Investigators collected a great deal of physical evidence that pointed to Dye as the killer. Dye's palmprints were found on a nightstand near Hannah's body. Dye's fingerprint, made in Hannah's blood, was found on a clothing tag near her body.

Dye's shoeprints were found on papers strewn on the bedroom floor. One of these papers had the palmprints in Hannah's blood from both Dye and Hannah. Police seized Dye's shoes during the execution of a search warrant at his residence, and Hannah's blood was found in the inner stitching and fibers of the shoes. Finally, analysis of DNA in the sperm found on the washcloth matched Dye's with odds of 1 in 39 billion.[1]

Dye initially told police that he had never been to Myrna's apartment and had not left his residence on the night of the murders. However, he testified at trial that he walked to get cigarettes at about 2:45 a.m. on the night of the killing and kept walking to Myrna's apartment, because Myrna had told him days earlier that she would be off work on Sunday night. He testified that upon his arrival at Myrna's apartment he found the door open, walked inside, saw a foot, walked over to Hannah's body, touched her, concluded she was dead, and left. He did not call the police. He returned home but could not sleep, and clocked in at work at 5:26 a.m.

A jury convicted Dye of three counts of murder. The jury recommended that the death penalty be imposed, and the trial court followed that recommendation and sentenced Dye to death.

## I. Alleged Discovery Violations

■ Dye contends that the State violated the discovery rules of Marion County by belatedly disclosing several pieces of evidence. He also argues that these "egregious" violations deprived him of his "state and federal due process rights and his right to present a defense."[2] Trial

---

1. Dye testified at trial that, in the course of his sexual practices with Myrna, he would sometimes ejaculate in a washcloth and had done so the Wednesday before Myrna left him. Myrna testified that, after Dye had ejaculated on her, she would either take a bath or clean herself with a washcloth. However, she testified that her last sexual contact with Dye was in the early part of June and that she had taken no dirty washcloths with her when she moved.

2. "Due process" is a term found in the Fourteenth Amendment of the U.S. Constitution. It does not appear in the Indiana Constitution. The closest state analog is the "due course of law" provision in Article I, Section 12. Dye does not cite that provision, let alone offer a separate analysis based on the state constitution. Accordingly, any state constitutional claim is waived. *Valentin v. State,* 688 N.E.2d 412 (Ind.1997).

courts are given wide discretion in discovery matters because they have the duty to promote the discovery of truth and to guide and control the proceedings. *Braswell v. State*, 550 N.E.2d 1280, 1283 (Ind. 1990). They are granted deference in determining what constitutes substantial compliance with discovery orders, and we will affirm their determinations as to violations and sanctions absent clear error and resulting prejudice. *Id.; Kindred v. State*, 524 N.E.2d 279, 287 (Ind.1988). When remedial measures are warranted, a continuance is usually the proper remedy, but exclusion of evidence may be appropriate where the violation "has been flagrant and deliberate, or so misleading or in such bad faith as to impair the right of fair trial." *Kindred*, 524 N.E.2d at 287.

### A. *The Crowbar*

The day after the killings a crowbar was discovered in the alley running behind Myrna's apartment. The crowbar's existence was promptly disclosed to the defense, as was a report that it had been tested for the presence of human blood and tested positive. On March 13, 1997, detectives, at the direction of the prosecutor's office, again interviewed Myrna and Theresa. Myrna confirmed that Dye had owned a crowbar similar or identical to the one found. The detective promptly advised a deputy prosecutor of what he had learned, and the deputy instructed him to write an interdepartmental memo memorializing the conversation. The detective wrote the memo and gave it to a paralegal in the prosecutor's office. The paralegal apparently misfiled the memo and failed to route it to the prosecutors or defense attorneys who would try the case.[3] As a result, Myrna's statements that the crowbar belonged to Dye were not disclosed to the defense until August 13, 1997, three weeks before Dye's trial was to begin. Upon receipt of the memo, defense counsel filed a motion to exclude any evidence relating to the crowbar, contending that the State's belated disclosure of the interdepartmental memo "is in total and complete violation of the Rules of Discovery of the Marion Superior Court, is contemptuous, and is deserving of the most severe sanctions." The trial court conducted a hearing on the motion and denied the motion to exclude the evidence, observing that "[t]here are other remedies available to the defendant."

Dye points to Rule 7 of the Rules of Organization and Procedure of the Marion Superior Court, Criminal Division. Section 1(a) of that rule provides that "[t]he court at initial hearing will automatically order the State to disclose and furnish all relevant items and information under this Rule to the defendant(s) within twenty (20) days from the date of the initial hearing. . . ." The information here, however, was not known to exist within twenty days of the initial hearing, but rather was uncovered by the State months later during the course of its preparation for trial. Under these circumstances, the State nevertheless had the obligation to make timely disclosure of the evidence to the defense. The five month delay here can hardly be viewed as timely. Nevertheless, accepting the State's explanation at face value, the belated disclosure was not flagrant or deliberate, and disclosure nevertheless occurred three weeks before trial. This was sufficient time to allow

3. Rule 5.3(b) of our Rules of Professional Conduct require that "[a] lawyer having direct supervisory authority over [a] nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer." Although sending a memorandum to the appropriate attorneys is a clerical task appropriately assigned to a paralegal, the prosecutors assigned to a case nevertheless bear the ultimate burden of ensuring compliance with the discovery rules. This is especially true under the circumstances here, where a deputy prosecutor knew of—indeed, requested that detectives take—an important statement from a crucial witness. That this is a death penalty case only heightens the need for attorneys within the prosecutor's office to ensure that paralegals are turning over all discovery in a timely manner.

defense counsel to re-depose the necessary witnesses before trial, which was done. Under these circumstances, the trial court's denial of Dye's request to exclude the evidence and motion for continuance was not clear error, and in any event he has not demonstrated any resulting prejudice.[4] *Kindred,* 524 N.E.2d at 287.

◼ Dye also asserts error based on the State's belated disclosure of Theresa Jones' March 13 statement to detectives. Theresa told police that she had owned a crowbar similar to the one described by Myrna, but after being shown the crowbar found near the crime scene told police that it was not hers. She also told police that she could not recall whether her crowbar was in the trunk of her car when it was repossessed. This conversation was also memorialized in the same misfiled memo described above and not disclosed to the defense until the memo surfaced three weeks before trial. Dye argues that, because of the belated disclosure, he had an "inadequate opportunity to effectively use this information. Had time allowed, the defense could have explored the repossession of Theresa's car and if the crowbar was, indeed, in the trunk." He contends that the State's belated disclosure of this evidence constitutes a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.

As a threshold matter, there was no *Brady* violation because the evidence was disclosed to the defense three weeks before trial, *see Williams v. State,* 714 N.E.2d 644, 648–49 (Ind.1999), and the defense had ample opportunity to pursue any avenues raised by its disclosure and to adjust its strategy accordingly. Moreover, *Brady* and its progeny apply to evidence

that is "material" to guilt or punishment, i.e., evidence that creates a reasonable probability of a different result of a proceeding. *See, e.g., United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Theresa's statement to the police is hardly exculpatory or material to Dye's guilt. She told police that her crowbar was different from the one found near the crime scene, and questioning those individuals who repossessed her car would, in the best case scenario to the defense, have disclosed that no crowbar was found in her trunk. This would not exculpate Dye nor would it materially add to his defense in light of the overwhelming physical evidence connecting him to the crime.

### B. *Fingerprints and DNA Testing of John Jennings* [5]

◼ On August 22, 1997, after her deposition was taken by the defense, fingerprint examiner Diane Donnelly took the fingerprints of Theresa Jones' boyfriend, John Jennings. Donnelly generated a report, dated September 2, the first day of jury selection, that compared a number of unidentified latent fingerprints from the crime scene with those submitted by Jennings, and found no matches. According to the State, it did not receive Donnelly's report until the evening of September 9, and it turned the report over to the defense early the following morning. In addition, the prosecutor's office directed a detective to transport Jennings for a blood draw on August 22. DNA analysis excluded Jennings as the contributor of any of the unknown DNA from the crime scene. Defense counsel objected to both the admission of the fingerprint comparisons and DNA analysis of Jennings on the ground

---

**4.** Dye also suggests that he was misled by some answers given by State's witnesses during pretrial depositions. However, he does not contend that these answers were not correct according to the witness's knowledge at the time of their respective depositions. Moreover, Dye had the opportunity to re-depose these witnesses before trial, in light of the information belatedly disclosed to him on

August 13. This presents no basis for reversal.

**5.** Dye also mentions evidence of shoeprints but then notes that the trial court excluded this evidence. Accordingly, any belated disclosure of this evidence presents no basis for reversal.

of its late disclosure. The State responded that it requested this analysis after identifying the defense theory that someone else, possibly Jennings, had committed the murders. Dye initially sought exclusion of the evidence, but was instead granted a continuance until the noon hour. The trial court observed that it agreed "with the State in that I believe that they had a duty and an obligation to try to compare these prints, even at this late date. So although it is a violation of discovery rules, due to the circumstances there will be no sanctions imposed."

We find the State's explanation for the belated disclosure more than adequate under the circumstances. Although its late decision to test these materials was a reasonable response to an expected defense trial theory, it nevertheless ran the risk, in the event of either a fingerprint or DNA match, of providing the defense with powerful evidence to bolster its case. However, the results instead exculpated Jennings. This at most forced a minor adjustment to the defense theory that some unidentified person may have committed the killings.

Dye alleges prejudice based on his opening statement to the jury in which he "hemmed himself in . . . by telling the jury that there would be no dispute about the scientific evidence. . . . [Dye] could not later challenge the scientific evidence about which he did not yet know." In addition, Dye's opening statement spoke in generalities about the possibility that someone other than Dye had committed the killings: "We are not going to be able to tell you who killed these children. We do not know." However, Dye made no specific mention of Jennings by name as the possible perpetrator during opening statement. His expressed decision not to challenge the scientific evidence hardly prevented him from challenging scientific evidence not yet known at the time of his opening statement. The trial court granted a continuance to allow Dye's expert to compare the fingerprints. Had Dye's expert concluded that any of the prints found at the crime scene were Jennings', he could have presented this to the jury through his expert and also pointed out the belated disclosure of the State's comparisons in cross-examination of Donnelly. Dye did not offer the testimony of his fingerprint expert, and the obvious inference is that his expert's conclusions were similar to those of Donnelly. The trial court's continuance until the noon hour was an adequate remedy under these circumstances and Dye has demonstrated no prejudice as a result of this ruling.

### C. Other Alleged Violations

 As a final point, Dye quotes from his pretrial motion for continuance, filed days before trial, which alleged other discovery violations. However, Dye makes no separate argument regarding these alleged violations and accordingly any claim of error is waived for the failure to present a cogent argument. Ind. Appellate Rule 8.3(A)(7).[6]

### II. Failure to Provide Miranda Warnings

 Dye argues that some statements he made to police should have been suppressed because police failed to provide him with the Miranda warnings before questioning him.[7] At about noon on July

---

6. The State does not assert waiver but instead addresses the issue on its merits, pointing out that three of the witnesses mentioned in the motion were not called at trial by the State, the complained of portion of another witness's testimony was not presented at trial, an expert's report was timely disclosed, an amended transcript of a witness's statement was issued merely to correct "inaudibles" from an earlier transcript, and Dye learned of the oral statements of two other witnesses more than a week in advance of trial which was sufficient time to render them nonprejudicial to his case.

7. Dye captions his argument in terms of "state and federal rights self-incrimination and to counsel" but merely cites Article I, Sections 11–13 without making any separate analysis based on the state constitution. Any

22, two detectives went to Dye's place of employment to talk to him about Hannah's murder and the disappearance of Lawrence and Celeste. They informed Dye that he was neither a suspect nor under arrest but that they needed to ask him some questions in light of allegations by the family that he had made threats towards Myrna. He agreed to accompany the detectives to the police station, and they explained that police department policy required that he be handcuffed and placed in the backseat during his ride there. The handcuffs were removed upon arrival and Dye was taken to an interview room, where he spoke to detectives for about forty-five minutes. Dye told the detectives that he had never been to Myrna's apartment but had a pretty good idea where it was located. He also said that he had never left his residence on the night of the murder. When asked if he were capable of committing this crime, Dye replied "[i]f I ever had the thought, never the kids." This statement was made before the bodies of Celeste and Lawrence had been discovered. Much later in the day,[8] the detectives arranged a time on Wednesday at which to pick Dye up from work to transport him for a blood draw. Detectives explained that they sought a blood sample because it was possible that Hannah had been raped. At the agreed upon time on Wednesday, a detective picked Dye up at work. Dye rode, unrestrained, in the front seat of the detective's car. En route to the blood draw, the detective heard Dye breathing heavily and asked him what was wrong. Dye replied that he had never given a semen sample before. The detective responded that "[a]ll we've ever agreed to was you said you would provide a blood sample, nothing more...."

▬▬▬ Miranda warnings are required only in the context of custodial interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The Supreme Court has further explained interrogation as "either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Custody has been described as "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (in turn quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)) (per curiam)). Based on these authorities, this Court has described the custody issue as whether a reasonable person in the accused's circumstances would believe that he or she is free to leave. *Cliver v. State,* 666 N.E.2d 59, 66 (Ind.1996). A police officer's unarticulated plan to arrest or suspicions about a suspect has no bearing on the issue; rather, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Stansbury,* 511 U.S. at 324, 114 S.Ct. 1526 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

▬▬▬ As to the statements made during the initial interview with police, the State does not contest that the police questioned Dye. Accordingly, the issue turns on whether Dye was in custody at the time. Dye relies on *Loving v. State,* 647 N.E.2d

---

claim of error under the Indiana Constitution is waived. *See Valentin v. State,* 688 N.E.2d 412 (Ind.1997).

**8.** After this interview with police, Dye spent several more hours with police but points to no statements made during this time that should be suppressed. Accordingly, we need not address whether any custodial interrogation occurred subsequent to the initial interview described above.

1123 (Ind.1995), in which this Court reversed a conviction because the defendant was subjected to custodial interrogation without being advised of his Miranda rights. Although the officers in *Loving* did not consider the defendant a suspect, they never communicated that belief to him. Moreover, Loving was questioned at the crime scene by several police officers, then handcuffed and placed in the back of a marked police car to be taken to the police station where he was questioned without ever being told that he was free to leave. *Id.* at 1125. This Court held that, "[p]articularly in view of the initial use of handcuffs, ... a reasonable person in the defendant's circumstances would not have believed himself to be free to leave but would instead have considered his freedom of movement to have been restrained to the 'degree associated with a formal arrest.'" *Id.* at 1126 (quoting *Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517).

Unlike Loving, Dye was told by police that he was not a suspect and was specifically told that he was being handcuffed as a matter of standard procedure during transportation to the police station, where the handcuffs were immediately removed as promised. Both detectives testified at the suppression hearing that Dye was free to leave the interview at any time, and the totality of the circumstances surrounding the interview lead us to conclude that a reasonable person in these circumstances would not have considered his freedom of movement restrained to the degree associated with a formal arrest. Accordingly, the trial court did not err when it denied Dye's motion to suppress the statements made during his initial interview with police.

The alleged Miranda violation en route to the blood draw presents issues of both interrogation and custody. Here, the detective's asking Dye what was wrong does not constitute interrogation under *Miranda* or the functional equivalent of questioning under *Innis*. *See Hopkins v. State*, 582 N.E.2d 345, 348 (Ind.1991) ("volunteered statements are admissible absent *Miranda* warnings"); *see also Loving*, 647 N.E.2d at 1126. Moreover, Dye was not in custody at the time the statement was made. The blood draw was arranged in advance to take place over Dye's lunch hour, and he was transported in the front seat of the police car without any type of restraint. The trial court properly denied Dye's motion to suppress.

## III. Rulings on Challenges for Cause

Dye argues that the trial court improperly excluded one juror for cause and erroneously denied his motion to exclude two other jurors for cause. He contends that this violated his "state and federal rights to due process and to an impartial jury."[9]

### A. *Excused for Cause*

The trial court excluded for cause one juror who expressed strong views opposing the death penalty. In response to a question on the jury questionnaire about the circumstances under which he believed the death penalty would be appropriate, the juror responded "[t]o save society or mankind as a whole when there is no defense." The prospective juror further explained this as "[t]he Hitler argument" and was then questioned at some length by the trial court, State, and defense counsel. The prospective juror stated during this questioning that he could recommend the death penalty in a case of an individual similar to Adolph Hitler and possibly Oklahoma City bomber Timothy McVeigh. However, he later observed that this case involved the alleged killing of three individuals and agreed that he "could never consider" recommending the death penalty for such a crime. When asked whether he would be able to follow his oath as a juror and consider the death penalty "as a viable

9. Once again, any state constitutional claim is waived for the failure to make a separate argument under the Indiana Constitution. *See supra* notes 2 and 7.

option in this case" he stated that he would not.

### 1. *Juror Exclusion Under the Federal Constitution*

■ The relevant inquiry for exclusion of jurors for cause under the federal constitution is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). As the Court explained in *Witt*, "the quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of...." 469 U.S. at 423, 105 S.Ct. 844. The *Witt* "standard does not require that a juror's bias be proved with unmistakable clarity. Deference must be paid to the trial court who was able to see the prospective jurors and listen to their responses during *voir dire*." *Underwood v. State*, 535 N.E.2d 507, 513 (Ind.1989).

In Indiana, juries in capital cases are instructed that they must consider whether the State has proven an aggravating circumstance beyond a reasonable doubt, and if that is done, they must then weigh the aggravator(s) against any mitigating evidence. Jurors who state at the outset that they will not recommend a death sentence even if the State proves one or more statutory aggravating circumstance are incapable of following the court's instructions and are accordingly properly excused for cause. The questioning described above demonstrated that this prospective juror's views on the death penalty would have prevented him from following the court's instructions and his oath.

■ Dye contends that it was nevertheless error for the trial court to excuse the juror for cause because he stated that he "could consider the death penalty under certain circumstances and in fact, believed it to be an appropriate penalty." As ex-

plained above, the relevant inquiry is not whether the prospective juror could recommend the death penalty in any conceivable case, including genocide or the most famous of mass murders. Rather, the issue is whether the jury can follow the court's instructions and the juror's oath in this case.

In most reported cases, excused prospective jurors have stated blanket opposition to the death penalty. *See, e.g., Davis v. State*, 598 N.E.2d 1041, 1047 (Ind.1992) (after being asked if there are "any circumstances" under which prospective juror could vote to recommend the death penalty, juror responded "No sir"); *Benirschke v. State*, 577 N.E.2d 576, 582–83 (Ind.1991) (prospective jurors indicated they were opposed to the death penalty and "could not find a case where it would be appropriate"); *Underwood*, 535 N.E.2d at 513 (prospective juror "candidly expressed several times that she could not consider the death penalty"); *Burris v. State*, 465 N.E.2d 171, 178 (Ind.1984) ("all of the excused veniremen stated that under no circumstances would they consider imposition of the death penalty"). We find no case from this Court directly addressing the issue Dye raises. However, several cases imply that the necessary inquiry is whether the prospective juror could recommend the death penalty in the case on trial, not in any case. In *Davis*, 598 N.E.2d at 1047, the prosecutor asked if a prospective juror could recommend the death penalty "[u]nder any circumstances that you can imagine uh, as have been described to you in this case[.]" The juror responded "No" and this Court upheld the removal for cause under *Witt*. We observed that "[t]here need be no ritualistic adherence to a requirement that a prospective juror make it unmistakably clear that he or she would automatically vote against the imposition of capital punishment." *Id.* Similarly, in *Daniels v. State*, 453 N.E.2d 160, 167 (Ind.1983), this Court reviewed the removal for cause of a prospective juror who, after initially stating he did not be-

lieve in the death penalty, stated that he thought it might be warranted in the case of the assassination of a president. The following colloquy then took place between the trial court and the prospective juror:

Q. "Then other than the president you can't think of any instances or any circumstances involving a murder that you would feel would warrant recommendation of the death sentence?"

A. "No."

Q. "And your feelings would preclude you from recommending the death penalty if the Defendant was found guilty, is that right?"

A. "Yes, Ma'am."

*Id.* at 167. Applying the then-existing federal constitutional standard of *Witherspoon*,[10] this Court upheld the exclusion.

The basic logic of *Witt* is that it is proper to excuse jurors who are unable to carry out their duties in the case before them. A juror's willingness to recommend a death sentence under other circumstances is irrelevant to that inquiry. Because the prospective juror here stated that his views on the death penalty would render him unable to follow the court's instructions and his oath, exclusion was proper under the federal constitutional standard of *Witt*.

2. *Exclusion Under Indiana Code § 35–37–1–5(a)(3)*

Most of our death penalty cases have been resolved under federal constitutional standards, presumably because that was how the issue was framed at trial and on appeal. *See, e.g., Davis,* 598 N.E.2d at 1046–47 (applying *Witt*); *Jackson v. State,* 597 N.E.2d 950, 961 (Ind. 1992) (applying *Witherspoon*); *Benirschke,* 577 N.E.2d at 582–83 (applying *Witt*); *Evans v. State,* 563 N.E.2d 1251, 1257 (Ind.1990) (applying *Witherspoon* while also quoting the statute); *Underwood,* 535 N.E.2d at 513 (applying *Witt*). However, Dye also objected at trial on the basis of Indiana Code § 35–37–1–5(a)(3), which provides as one of several "good causes for challenge" that "[i]f the State is seeking a death sentence, that the person entertains such conscientious opinions as would preclude the person from recommending that the death penalty be imposed." Accordingly, we must address whether the exclusion of this juror violated the statute, which arguably sets a higher bar than *Witt. See generally* 16B WILLIAM ANDREW KERR, INDIANA PRACTICE § 21.6d at 151–52 (1998).[11]

Dye suggests that exclusion was improper under the statute because the prospective juror stated that he could consider the death penalty under some circumstances. The statute speaks in terms of preclusion from recommending the death penalty and does not specifically address whether the preclusion must be in the particular case only or in all cases, no matter how far afield their facts may be from the case at bar.

---

10. *See Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The *Witherspoon* standard, as commonly applied at the time, permitted excusing only those jurors who make "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt." Id.* at 522 n. 21, 88 S.Ct. 1770 (emphasis in original). In *Witt,* the Supreme Court made clear that the Court's holding in *Witherspoon* "focused only on circumstances under which prospective jurors could *not* be excluded; under *Wither-*

*spoon's* facts it was unnecessary to decide when they *could* be." *Witt,* 469 U.S. at 422, 105 S.Ct. 844 (emphasis in original). *Witt* concluded that the quoted footnote language from *Witherspoon* was "dicta" and "not controlling." *Id.*

11. Dye contends that this statute is a codification of the standard set forth by the United States Supreme Court in *Witherspoon.* This is incorrect. Although the statutory language is somewhat similar to *Witherspoon,* the statutory provision has been on the books in a virtually identical form for over a century— long before *Witherspoon. See* KERR, *supra* § 21.6d, at 149 n. 42.

The prospective juror in Dye's case stated opposition to the death penalty with a very narrow exception (Hitler) that did not apply to Dye's case. The juror went on to explain his unequivocal opposition to the death penalty under his limited knowledge of the facts of Dye's case (the killing of three children). Although his opinions may not have precluded a recommendation of death in every hypothetical case, they did preclude a recommendation of the death penalty in this case. For the same reasons already explained, we believe this is all that is required under the statute. Accordingly, because the prospective juror's conscientious opinions precluded him from recommending the death penalty in this case, exclusion was proper under Indiana Code § 35–37–1–5(a)(3).[12]

### B. Failure to Excuse for Cause

■ Dye also argues that the trial court erred by failing to excuse two prospective jurors for cause upon his motion. Although both of these jurors at some point expressed the view that they would automatically vote to impose the death penalty in the case of a knowing or intentional murder, their views were tempered by subsequent questioning. Both jurors were told that the law required them to make a recommendation after weighing the aggravating and mitigating circumstances. The first juror agreed that there was a "possibility" that she would not recommend the death penalty and agreed she could set aside her personal beliefs and follow the law and her oath. The other juror also stated that it was "possible" that he would vote against the death penalty and agreed that he would weigh the aggravators and mitigators in good faith and apply the law as it was given to him.

■ Dye contends that exclusion for cause was required by *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In *Morgan,* the Supreme Court held that the trial court's refusal to inquire whether prospective jurors would automatically vote to impose the death penalty upon conviction violated the Due Process Clause of the Fourteenth Amendment. However, in this case the trial court did inquire about the possibility that these jurors would vote automatically to impose the death penalty and defense counsel were afforded the same opportunity to inquire. This questioning revealed that these prospective jurors understood that both the law and their oath were contrary to their view favoring an automatic recommendation of death and agreed that they would follow the law and their oath. The trial court did not err by failing to exclude them.[13]

## IV. Fair Cross–Section of the Jury Pool

■ Dye argues that his jury was not selected from a venire that represented a fair cross-section of the community. Be-

---

**12.** Dye quotes the following language from this Court's opinion in *Baird v. State,* 604 N.E.2d 1170, 1185 (Ind.1992), "[o]nly jurors who state, without equivocation or self-contradiction, that they would not vote for death in any case can be excluded...." *Baird* cites *Witherspoon* and *Lamar v. State,* 266 Ind. 689, 366 N.E.2d 652 (1977), an Indiana case applying *Witherspoon,* as support. *Baird* does not cite the statute, and *Lamar* cites the statute without quoting the language of subsection (3). *Lamar* instead cites and applies *Witherspoon.* As explained above, the federal constitutional standard of *Witherspoon* has been replaced by *Witt.* Moreover, *Baird* did not purport to be interpreting the statute.

**13.** As the State points out, even if a trial court erroneously refuses to remove for cause jurors who declare that they will vote to impose death automatically, a death sentence may be affirmed if the jurors were nevertheless removed through the use of peremptory challenges. *See Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). The relevant inquiry is whether any such jurors sat on the jury which ultimately sentenced the defendant to death. *Id.* at 85–86, 108 S.Ct. 2273. In Dye's case, both jurors were excused through the use of peremptory challenges and he does not contend that the use of these challenges prevented him from excusing other prospective jurors who would have voted to impose death automatically.

fore trial 150 prospective jurors completed questionnaires that included a question about race. After reviewing the questionnaires, Dye discovered that only eighteen of the 150 potential jurors identified themselves as African–American.[14] He filed a "Motion to Stay Proceedings or Dismiss the Information Based upon Racial Discrimination in the Jury Venire" which sought either time to allow investigation of the racial disparity, supplementation of the venire pursuant to Indiana Code § 33–4–5–2(d) & (e), or dismissal of the information. The trial court denied the motion.

■ In order to make a prima facie showing of a violation of the fair cross-section requirement, a defendant must establish

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Dye acknowledges that he bears the burden of establishing a *Duren* violation, *see, e.g., Bond v. State,* 533 N.E.2d 589, 591 (Ind. 1989), and concedes that he cannot meet the third prong of *Duren* based on the record before us. He nevertheless asserts error based on the trial court's denial of his motion to stay the proceedings or supplement the venire pursuant to Indiana

Code § 33–4–5–2(d) & (e). That statute provides that "[t]he jury commissioners may supplement voter registration lists and tax schedules ... with names from lists of persons residing in the county that the jury commissioners may designate as necessary to obtain a cross section of the population of each county commissioner's district...." IND.CODE § 33–4–5–2(d) (1998). The supplemental sources "may consist of such lists as those of utility customers, persons filing income tax returns, motor vehicle registrations, city directories, telephone directories, and driver's licenses...." *Id.* § 33–4–8–2(e). As noted above, Dye made no showing that supplementation was necessary to comply with *Duren,* and we see no basis for requiring trial courts under such circumstances to utilize this discretionary statutory provision for supplementation.

■ The use of voter registration lists complied with statute. *See* IND.CODE § 33–4–5–2 (1998).[15] In addition, the trial court also had a duty to comply the constitutional requirements set forth in *Duren,* which it did. It was not required to supplement the voter's registration lists. *See Bradley v. State,* 649 N.E.2d 100, 103–04 (Ind.1995) ("Absent constitutional infirmity, however, we decline to construe [Indiana Code § 33–4–5–2(d) ] so as to convert an option into a mandate."). Nor was the trial court required to grant Dye a stay for further investigation of systematic exclusion. Dye did not raise the issue until days before trial when a lengthy continuance would have been required to conduct the study Dye requested.[16] We review a trial court's

---

14. It was later revealed during voir dire that one of the eighteen was mentally handicapped and had erroneously listed her race as African–American.

15. In addition, this Court has expressed approval of the use of voter registration lists from which to select a pool of prospective jurors. *See, e.g., Fields v. State,* 679 N.E.2d 1315, 1318 (Ind.1997); *Bradley v. State,* 649 N.E.2d 100, 104–05 (Ind.1995); *Concepcion v. State,* 567 N.E.2d 784, 788 (Ind.1991) (citing *Burgans v. State,* 500 N.E.2d 183 (Ind.

1986)); *Smith v. State,* 475 N.E.2d 1139, 1142–43 (Ind.1985).

16. In his reply brief, Dye asks that this Court take judicial notice of the results of a not-yet-completed study in a pending capital case that examines the possible systematic exclusion of African Americans from jury venires in Marion County. Evidence Rule 201(a) permits courts to take judicial notice of a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2)

denial of a continuance for an abuse of discretion. *Perry v. State,* 638 N.E.2d 1236, 1241 (Ind.1994). Under these circumstances, the denial of Dye's motion for a stay was not an abuse of discretion.

## V. The Clemency Instruction

■ Dye contends that the trial court erred when it instructed the jury on clemency. Indiana Code § 35–50–2–9(d) provides, in relevant part, that "[t]he court shall instruct the jury concerning ... the availability of good time credit and clemency." [17] Dye tendered an instruction that provided:

> The Governor of Indiana has the power, under Indiana Constitution, to grant reprieve, commutation, or pardon to a person convicted and sentenced for murder. The Constitution leaves it entirely up to the Governor whether and how to use this power. This power is used sparingly and its imposition, while possible, should not be considered as a likely result.

Over Dye's objection, the trial court struck the last sentence of this tendered instruction. Dye argues on appeal that "what trial counsel sought to do was eliminate speculation through complete and accurate information about the possibility of clemency.... The speculation that jury could have entertained is endless." [18]

■ A trial court erroneously refuses a tendered instruction, or part of a tendered instruction, when: (1) the instruction correctly sets out the law; (2) evidence supports the giving of the instruction; and (3) the substance of the tendered instruction is not covered by the other instructions given. *Byers v. State,* 709 N.E.2d 1024, 1028–29 (Ind.1999). The last sentence of Dye's tendered instruction fails on both the first and second prongs.

A correct statement of the law regarding clemency is provided for by the Indiana Constitution and by statute. [19] The part of Dye's tendered instruction that was refused by the trial court was not a statement of law at all. Rather, it was a statement of historical practice surrounding clemency in Indiana. Moreover, not only is this language not legal in nature, there is no basis to conclude that it was correct, if viewed as a prediction of future Governors' actions. Although the exercise of the power to grant clemency may have been rare under current and prior Indiana Governors, there is no way to determine whether a future Governor may alter this trend of executive restraint and grant clemency to a significant number of inmates. *See generally* Isabel Wilkerson, *Clemency Granted to 25 Women Convicted for Assault or Murder,* N.Y. Times, Dec. 22, 1990, at 1 (discussing the grant of

capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The study alluded to here is not a proper subject of judicial notice. According to the limited information in the reply brief, the study has taken weeks or months and a similar study has never before been done. Its subject matter is neither "generally known" within the jurisdiction nor do the conclusions of such a study seem to be "capable of accurate and ready determination" by resort to sources that cannot be reasonably questioned. .

17. This language was added to the statute in 1993. *See* Pub.L. 250–1993, § 2, 1993 Ind. Acts 4481.

18. Dye concedes that giving an instruction that tells the jury that the governor has the

power to commute a sentence does not violate the Eighth Amendment, applicable to the states through the Fourteenth Amendment. *See California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983).

19. "The Governor may grant reprieves, commutations, and pardons, after conviction, for all offenses except treason and cases of impeachment, subject to such regulations as may be provided by law." Ind. Const. art. V, § 17. Such applications are to be filed with the parole board, which shall make a recommendation to the Governor after (1) notifying (A) the sentencing court, (B) the victim of the crime or next of kin, and (C) the prosecuting attorney for the county where the conviction was obtained and (2) conducting an investigation and (3) hearing. Ind.Code § 11–9–2–1 to –2 (1998).

clemency by former Ohio Governor Richard Celeste to women convicted of killing or assaulting husbands or companions alleged to have physically abused them). The trial court did not err by modifying Dye's tendered instruction on clemency.

## VI. Appropriateness of the Death Sentence

As a final point, Dye attacks the appropriateness of his death sentence. According to statute, a death sentence is subject to "automatic review" by this Court. *See* IND.CODE § 35–50–2–9(j)(1998). Although this Court has the constitutional authority to review and revise sentences, IND. CONST. art. VII, § 4, it will not do so unless the sentence imposed is "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 17(B). The Court has explained this standard as "not whether in our judgment the sentence is unreasonable, but whether it is clearly, plainly, and obviously so." (*Prowell v. State,* 687 N.E.2d 563, 568 (Ind.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 104, 142 L.Ed.2d 83 (1998)). In reviewing a death sentence, however, we have noted that "these harsh requirements 'stand more as guideposts for our appellate review than as immovable pillars supporting a sentence

decision.' " *Id.* (quoting *Spranger v. State,* 498 N.E.2d 931, 947 n. 2 (1986)).

Dye contends that the death sentence is not appropriate when the one aggravating circumstance is weighed against the mitigating evidence presented, particularly the alleged "residual doubt" surrounding his guilt. *See generally Miller v. State,* 702 N.E.2d 1053, 1069 (Ind. 1998) (describing "residual doubt" and holding that the failure to argue it to a jury does not constitute ineffective assistance of counsel). The State alleged as an aggravating circumstance that Dye killed Celeste after having murdered Hannah.[20] *See* IND.CODE § 35–50–2–9(b)(8) (1998). Dye offered the testimony of six witnesses at his penalty phase.[21] The jury found that the aggravator outweighed any mitigators and recommended that the death penalty be imposed. After a sentencing hearing at which Dye presented the testimony of an additional witness, the trial court agreed[22] and imposed the death sentence.

The trial court's sentencing order explicitly rejected Dye's "residual doubt" argument, finding that the evidence "was more than sufficient to prove beyond a reasonable doubt that the defendant committed the murders with which he was charged.

**20.** The State also alleged, on a separate charging instrument filed on the same day, that Dye killed Lawrence after murdering Hannah. However, the jury was not presented with this second aggravating circumstance nor did the trial court make any mention of it in its sentencing statement or sentencing order.

**21.** A Marion County probation officer testified that Dye was compliant during his probationary sentence for a Class A misdemeanor battery offense against Myrna. "He did what he was supposed to do. He finished his counseling and he paid his money and he kept his appointments." Dr. Odie Bracy, III, a clinical neuropsychologist, testified that overall Dye "presented fairly normally.... [H]e was very cooperative, very friendly, presented no problems whatsoever during the entire day.... He showed a good capability to learn, to comprehend, to follow instructions, and exhibited an excellent memory." Three

Marion County corrections' officers testified that they had never had any problems with Dye during his pretrial incarceration. Finally, a public information officer from the Department of Correction testified that 186 of the 1536 men serving sentences in the general prison population for murder were convicted of multiple killings. She testified that twenty-seven of the fifty men on death row were there for multiple murders. On cross-examination the witness testified that multiple murder means two or more and that she did not have the statistics for those who committed three murders.

**22.** The trial court found that the State had proven the aggravating circumstance beyond a reasonable doubt and found as a mitigating circumstance that "[a]lthough he defendant's history of prior criminal conduct cannot be considered significant, the circumstances surrounding [his] battery conviction [against Myrna in 1992 was] significant."

There is no 'residual doubt' when considering the reasonable doubt standard." The trial court's sentencing order recounted some of the evidence against Dye including that his left palmprint was found on a table near where Hannah was found, that his bloody fingerprint was found on a garment tag lying near Hannah's body, and that his semen was found on a washcloth found next to her body.

Dye's residual doubt argument on appeal focuses on a few pieces of unidentified evidence, specifically hairs found on Hannah's chest, a dried crusty substance found on her thigh and pubic hair, as well as the absence of Dye's footprints outside the apartment, the absence of his fingerprints in the area where he must have picked up a knife and the absence of fingerprints on the hammer believed to have been used to bludgeon Hannah and Celeste. He also points to a fingerprint that was found on a glass in Myrna's apartment and was compared to twenty people who may have been inside the apartment (including Dye), but remained unidentified. Defense counsel was free to argue—and did argue—these items to the jury in both the guilt and penalty phases and to the trial court at sentencing. However, in light of the significant physical evidence that connected Dye to these murders, the jury and trial court were not persuaded by these few loose ends. Some of this evidence is arguably attributable, as the State points out, to the fact that Myrna's furnished apartment "was a filthy, oft-rented unit with used carpeting, used furniture and a dirty mattress." We are no more persuaded by Dye's residual doubt argument than were the jury and trial court. Residual doubt presents no basis for reversal here.

■ As a final point, we observe that Dye points to no other alleged mitigating circumstances, save his lack of a significant criminal history found by the trial court. Considering the nature of the offense and the character of the offender as presented through the proffered mitigating evidence,[23] we are not persuaded to revise this sentence.

## Conclusion

Walter Dye's convictions for murder and death sentence are affirmed.

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Justice, concurring.

I concur in the Court's opinion. I write to provide additional review of the appropriateness of the death sentence imposed here. *Cooper v. State*, 540 N.E.2d 1216, 1218 (Ind.1989) ("In contrast to appellate review of prison terms and its accompanying strong presumption that the trial court's sentence is appropriate, this Court's review of capital cases under arti-

---

**23.** Dye contends that the evidence "presented to the jury primarily painted [him] as an average Joe with no serious psychopathology." He points to his stable work history, compliance with probation terms and corrections officers while awaiting trial, his brother's testimony that he was not capable of the killings, and a letter from his daughter telling him that she missed and loved him. However, Dye points to only one potentially mitigating circumstance alleged to have been overlooked by the trial court based on this evidence. Citing *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), he contends that the trial court apparently overlooked the testimony from corrections officers about his compliant behavior because "it does not appear in [the] sentencing order." In *Skipper*, the Supreme Court held that it was error for a state trial court to exclude the testimony of jailers and a "'regular visitor' to the jail to the effect that petitioner had 'made a good adjustment' during his time spent in jail." *Id.* at 3, 106 S.Ct. 1669. The Court observed that the exclusion of this "relevant mitigating evidence impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." *Id.* at 8, 106 S.Ct. 1669. Unlike *Skipper's* jury, Dye's jury heard this testimony and nevertheless recommended that death be imposed. *Skipper* presents no basis for reversal here.

cle 7 is part and parcel of the sentencing process. Rather than relying on the judgment of the trial court, this Court conducts its own review of the mitigating and aggravating circumstances 'to examine whether the sentence of death is appropriate.' . . . The thoroughness and relative independence of this Court's review is a part of what makes Indiana's capital punishment statute constitutional.") (citations omitted).

As to the appropriateness of the death penalty in this case, the statute guides this Court's review by setting forth standards governing imposition of death sentences. Following completion of the guilt phase of the trial and the rendering of the jury's verdict, the trial court reconvenes for the penalty phase. Before a death sentence can be imposed, our death penalty statute requires the State to prove beyond a reasonable doubt at least one aggravating circumstance listed in subsections (b)(1) through (b)(12) of the statute. Ind.Code § 35–50–2–9 (Supp.1996). Here the State supported its request for the death penalty with the aggravating circumstance that Dye committed multiple murders (those of Hannah Clay and Celeste Jones), *id.* § 35–50–2–9(b)(8).

To prove the existence of this aggravating circumstance at the penalty phase of the trial, the State relied upon the evidence from the earlier guilt phase of the trial (with respect to which the jury had found Dye guilty of the two murders, as well as the murder of Lawrence Cowherd). The death penalty statute requires that any mitigating circumstances be weighed against any properly proven aggravating circumstances. The Court's opinion accurately describes Dye's argument in favor of mitigating circumstances. The jury returned a unanimous recommendation that a sentence of death be imposed.

Once the jury has made its recommendation, the jury is dismissed, and the trial court has the duty of making the final sentencing determination. First, the trial court must find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Ind.Code § 35–50–2–9(k)(1) (Supp.1996). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. *Id.* § 35–50–2–9(k)(2). Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. *Id.* § 35–50–2–9(e). The trial court must make a record of its reasons for selecting the sentence that it imposes. *Id.* § 35–38–1–3 (1988).

In imposing the death sentence, the trial court found that the State proved beyond a reasonable doubt a charged aggravating circumstance listed in the death penalty statute—that Dye had committed multiple murders. The record and the law supports this finding.

The trial court found little in the way of mitigating circumstances to exist. The court found only that Dye's history of prior criminal conduct was not significant (he had been convicted of two Class A misdemeanors—Driving While License Suspended in 1989 and Battery in 1992). However, the court did note that the circumstances surrounding the battery were significant because the victim of the battery was Myrna Dye. The court also considered, but did not find to exist, additional statutory mitigating circumstances and other purported mitigating circumstances offered by Dye. I agree with the trial court's and this Court's analyses of the mitigation in this case and find the mitigating weight to be in the low range.

As required by our death penalty statute, the trial court specifically found that the aggravating circumstance outweighed the mitigating circumstances. The trial court also gave consideration to the jury's recommendation. The trial court imposed the sentence of death.

Based on my review of the record and the law, I agree that the State has proven beyond a reasonable doubt an aggravating

circumstance authorized by our death penalty statute and that the mitigating circumstances that exist are outweighed by that aggravating circumstance. I conclude that the death penalty is appropriate for Dye's murder of Hannah Clay, Celeste Jones and Lawrence Cowherd III.